**NATIONAL WESTMINSTER BANK, U.S.A., Plaintiff,**

v.

**Walter L. ROSS, Defendant.**

**William L. YAEGER, as Chapter 7 Trustee of RPC Corporation, Plaintiff,**

v.

**NATIONAL WESTMINSTER BANK, U.S.A., Roy Grossman and Murray Markowitz, Defendants.**

**Nos. 86 Civ. 6277 (SWK), 89 Civ. 4959 (SWK).**

United States District Court, S.D. New York.

July 31, 1991.

As Amended Aug. 13, 1991.

Winston & Strawn, New York City by Edward N. Meyer, Arthur P. Hui and Susan R. Dyer, for plaintiff National Westminster Bank USA and defendants Roy Grossman and Murray Markowitz.

Ross & Hardies, New York City by Sean M. Sullivan, Helen D. Chaitman, for defendant Walter L. Ross and plaintiff William L. Yaeger.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

These related cases involve National Westminster Bank USA's ("Natwest" or the "Bank") efforts to recover upon a written guarantee (the "Guarantee") of RPC Corporation's ("RPC") president Walter L. Ross ("Ross"), and Ross's and RPC's "lender liability" claims. The essential facts are set forth in the Court's prior opinions, *National Westminster Bank v. Ross*, 676 F.Supp. 48 (S.D.N.Y.1987) ("*Natwest I*") and *National Westminster Bank v. Ross*, 86 Civ. 6277, slip op., 1988 WL 96032 (S.D.N.Y. August 30, 1988) ("*Natwest II*"), familiarity with which is assumed. Presently before the Court in Natwest's guarantee action (the "Natwest Action") is defendant Ross's motion for reconsideration of *Natwest II*, in which the Court granted Natwest's motion for summary judgment upon the Guarantee as to liability only and dismissed Ross's first (breach of contract), third (breach of fiduciary duty) and fourth (breach of good faith dealing) counterclaims. Also before the Court is Ross's motion for leave to file an amended counterclaim and the Bank's motions to enter final judgment and to strike Ross's jury demand.

Before the Court in the Trustee's action (the "Yaeger Action") are defendant Roy Grossman's ("Grossman") and Murray Markowitz's ("Markowitz") motions, pursuant to 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing the complaint for failure to state a claim upon which relief can be granted, and the Bank's motion, pursuant to Rule 56, for an order granting the Bank summary judgment dismissing the amended complaint or, in the alternative, striking the Trustee's jury demand. Also pending are the Trustee's cross-motions for partial summary judgment and for consolidation of the Yaeger and Natwest Actions.[1]

## I. *The Natwest Action*

The Court has received and reviewed the Report and Recommendation of Magistrate Judge Leonard Bernikow dated January 12,

---

1. Although the Trustee filed a memorandum of law and affidavit in support of a renewed motion to transfer, the Trustee neither filed nor served a notice of motion as required by Rule 3(c) of the Civil Rules for the Southern District of New York (Sept.1990), nor requested leave to file such a motion as required by my individual rules. *See* Individual Judges' Rules, Procedures and Forms in the United States District Courts for the Southern, Eastern, Northern and Western Districts of New York (Supp.1991). The applicable rule provides in relevant part:

Pre-Motion Conferences. Any party wishing to make a motion must write the Court in advance to request a premotion conference before submission of any papers. The letter should briefly explain the legal basis of the motion.... A conference will then be scheduled.

The purpose of this rule, among other things, is to insure that parties do not file motions which may be either untimely, frivolous or moot. Accordingly, the Court does not consider the Trustee's motion properly before it.

1990 (the "Report") issued in connection with Ross's motion, pursuant to Rule 15(a), for an order granting him leave to assert a consumer fraud counterclaim, to assert a tortious interference counterclaim, to implead Grossman and Markowitz, account officers at the Bank, as third-party defendants and to add to and clarify the original counterclaims. (A copy of the Report is annexed hereto as an Appendix.) The Report recommends that Ross's motion for leave to amend his answer be denied with respect to the first (breach of contract), third (breach of fiduciary duty) and fourth (breach of good faith dealing) counterclaims, upon the basis that those claims are barred by the doctrine of law of the case as a result of this Court's decision in *Natwest II.* The Report also recommends that leave to amend to clarify the common law fraud claim, and assert a consumer fraud claim, be denied. The Court has reviewed the parties' objections to the Report. For the reasons set forth below, the Report is adopted in part and rejected in part, and Ross's remaining counterclaims are dismissed in their entirety.

A. The Proposed Amended Counterclaims

■ The Court adopts that portion of the Report which denies Ross leave to amend his fraud counterclaim.[2] *See* Report at 687–88. Notwithstanding this Court's refusal on two earlier occasions to dismiss this claim, *see Natwest I*, 676 F.Supp. at 581; *Natwest II* at 5–6, the Court now agrees with the Magistrate Judge that Ross has failed to allege a viable fraud claim.

■ In evaluating the sufficiency of the fraud counterclaim, the Court acknowledges Ross's contention that a specific representation regarding future conduct, made with the undisclosed intention not to perform, is actionable fraud. *See Channel Master Corp. v. Aluminium Ltd. Sales*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Sabo v. Delman*, 3 N.Y.2d 155,

164 N.Y.S.2d 714, 143 N.E.2d 906 (1957). Clearly, "an action for fraud will lie if the promisor did not intend to keep his promise at the time he made it. His present intent is the fact misrepresented." *Hotel Constructors, Inc. v. Seagrave Corp.*, 574 F.Supp. 384, 387 (S.D.N.Y.1983). The law is well settled, however, that a party may not establish fraudulent intent solely from the non-performance of the future event. *See Pope v. New York Property Ins. Underwriting Ass'n*, 112 A.D.2d 984, 492 N.Y.S.2d 796 (2d Dept.), *aff'd in part and appeal dismissed in part*, 66 N.Y.2d 857, 498 N.Y.S.2d 360, 489 N.E.2d 247 (1985). The defrauded party must allege specific facts showing that the promisor intended not to honor his obligations at the time the promise was made. *See Songbird Jet Ltd., Inc. v. Amax Inc.*, 581 F.Supp. 912 (S.D.N.Y.1984), *aff'd*, 812 F.2d 713 (2d Cir. 1987); Fed.R.Civ.P. 9(b).

■ Misrepresentation of a promisor's present intent to perform a future act is only one of five necessary elements of a fraud claim. Under well-established requirements for pleading fraud, a claimant must allege with particularity not only a knowingly false misrepresentation and scienter but that the misrepresentation was of a fact material to the transaction, relied upon by the complainant to his detriment. *See Sabo v. Delman*, 3 N.Y.2d at 160, 164 N.Y.S.2d at 716, 143 N.E.2d at 907.

■ Although Ross repeatedly states that the Bank officers acted with present fraudulent intent, Ross alleges no evidentiary facts from which any rational trier of fact could directly or indirectly infer such intent. The fraud counterclaim simply states and restates, in conclusory fashion, that the Bank's officers never intended to perform and in fact failed to perform any of the promises made to RPC through Ross. Such allegations are insufficient, as a matter of law, to satisfy the requirements for properly pleading present fraud-

---

**2.** As a threshold matter, this Court concludes that the Magistrate Judge properly tested the fraud counterclaim for futility under *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). *See* Report at 685. The Court also adopts that portion of the Report finding that the motion to amend should not be denied upon the grounds of delay alone. *See Richardson Greenshields, Inc. v. Lau*, 825 F.2d 647 (2d Cir. 1987).

ulent intent. *See Songbird,* 581 F.Supp. at 925. Illustrative of Ross's failure to allege specific facts establishing fraudulent intent are the following allegations:

> In November 1985, Markowitz told Ross that RPC's line of credit was coming up for renewal and that the Bank would agree to extend the RPC line of credit for one year only if RPC paid the Bank a $30,000.00 "collateral management fee" and Ross agreed to invest an additional $100,000.00 in subordinate capital.
>
> \* \* \* \* \* \*
>
> At the time Markowitz and Grossman made this agreement they had no intention of honoring it. They made the agreement with the intention to induce Ross to put more of his own personal funds into RPC in order to enhance the Bank's position.

Proposed Amended Counterclaim ("PAC") ¶¶ 36, 38. These assertions of fraudulent intent, typical of those contained in Ross's fraud counterclaim, are wholly conclusory and contain no facts from which present fraudulent intent may be inferred. The allegation that the Bank requested Ross to supply additional capital in order to "enhance the Bank's position" adds nothing to Ross's fraud claim. It is but a truism that a lender's request for its borrower to infuse capital as a condition of restructuring or extending a loan is an obvious and overt attempt to reduce the lender's potential loss in the eventuality of a default.

■ Ross similarly fails to allege any facts giving rise to a duty to disclose. Although the record is uncontradicted that Bank employees made decisions concerning the Bank's lending relationship with RPC which were not immediately communicated to RPC, *see* Deposition of Murray Markowitz, dated February 9, 1989, annexed to Appendix of Exhibits to Affidavit of Sean M. Sullivan, sworn to November 9, 1989 ("Sullivan Aff."), as Exhibit "1," at 78–80, 90–92; Deposition of Roy Grossman, Sullivan Aff.Ex. "2," at 123–25, 129; Deposition of Austin Ludlow, Sullivan Aff.Ex. "3," at 75–76, 89, the Loan Agreements imposed no obligation upon the Bank to advise RPC

of its internal policy decisions and the Trustee has suggested no basis for the Court to imply such an obligation between the parties. Accordingly, the Court refuses to imply such an obligation upon the Bank independent of its contractual obligations.

■ Moreover, even accepting as true Ross's bald assertions of fraudulent intent and/or fraudulent failure to disclose certain facts, Ross fails to allege how any such representation, if false, concerned facts material to any transaction involving RPC in which Ross, as opposed to RPC, suffered resulting injury. In effect, Ross seeks to claim the corporation's alleged injury as his own. The law is clear, however, that

> [e]ven where [plaintiff] claims that [defendant's] actions destroyed his business reputation and good will, it is clear that the ultimate damage suffered [is] to [the] business[ ].... [P]laintiff, even as president and principal shareholder of the [corporation], may not claim the compan[y's] damages as his own.

*Sirinakis v. Colonial Bank,* 600 F.Supp. 946, 953 n. 10 (S.D.N.Y.1984); *accord Kruse v. Bank of America N.T. & S.A,* 202 Cal.App.3d 38, 248 Cal.Rptr. 217 (1st Dist. 1988), *cert. denied sub nom, Duck v. Bank of America,* 488 U.S. 1043, 109 S.Ct. 869, 870, 102 L.Ed.2d 993 (1989). For example, Ross's allegation that "[i]n or about October 1984, the Bank ... decided to manage RPC out of the Bank ... [but] did not inform Ross or anyone at RPC of this decision for more than four months," PAC ¶ 21, fails to allege an injury suffered by Ross attributable to the alleged nondisclosure. The further allegation that "[d]uring the succeeding months, Ross attempted to obtain alternate financing for RPC but the Bank's unilateral reduction of the inventory loan had so impaired RPC's financial condition that no other lender would finance the company," PAC ¶ 27, does nothing to substantiate Ross's fraud claim in light of the almost directly contrary allegation appearing on the face of the complaint: "Ross told Grossman that RPC, as a newly formed company, did not have the operat-

ing history necessary to obtain new financing at that time." PAC ¶ 25.[3]

■ Similarly, Ross's allegation that "[t]he Bank's officers falsely told Ross that the reason for terminating the RPC loan was the tri-state policy, when the real reason was the Bank's belief that RPC was connected with Richard Tikijian, thus depriving Ross of the opportunity to prove to the Bank that no such connection existed," fails to allege facts from which it might be inferred that such advice to the Bank would have reversed the Bank's alleged decision to terminate the RPC loan. Ross's various other allegations of fraud are plagued by similar difficulties. *See* Report at 687–88; PAC ¶¶ 37–39, 43, 54.

The Court concludes that, viewing the pleading as a whole and accepting Ross's allegations as true, Ross fails to allege any facts from which a reasonable trier of fact might infer fraudulent intent. Ross's motion to amend the fraud counterclaim is denied and that counterclaim is dismissed with prejudice.

■ In *Natwest I,* the Court refused to enforce the Guarantee's counterclaim waiver provision and dismiss Ross's remaining counterclaims. 676 F.Supp. at 53–54. The Court's determination there was based upon its finding that "[f]or the courts to give effect to such a clause would be violative of both public policy and morality, since an ultimate finding of fraud must of necessity vitiate the contract relied upon." *Id.* (citing *Sterling Nat'l Bank & Trust Co. v. Giannetti,* 53 A.D.2d 533, 384 N.Y.S.2d 176 (1st Dept.1976)). In view of the Court's adoption of that portion of the Magistrate Judge's Report denying leave to amend the fraud counterclaim, the Court finds that the Guarantee's waiver of offset or counterclaim[4] is no longer vitiated by Ross's allegations of fraud. The Court holds that the waiver provision is fully

enforceable against Ross, and bars his remaining counterclaims. *See Silbert v. Silbert,* 85 A.D.2d 661, 445 N.Y.S.2d 215 (2d Dept.1981); *Rusch Factors, Div. of BVA Credit v. Sheffler,* 58 A.D.2d 557, 396 N.Y.S.2d 374 (1st Dept.1977). In view of the Court's reconsideration of the enforceability of the Guaranty's waiver clause, Ross's motion for reargument and reconsideration of this Court's grant of summary judgment dismissing his first, third and fourth counterclaims in *Natwest II* is denied as moot. Accordingly, Ross's counterclaims are dismissed.

## B. Entry of Final Judgment

■ In support of its application to have the Court enter judgment in its favor on the Guarantee in an amount in excess of $1.5 million, Natwest has submitted the affidavit of Douglas Reeder, an assistant treasurer of Natwest, accompanied by spreadsheets containing various calculations. Ross opposes the application, arguing that Reeder has no personal knowledge of the matters contained in his affidavit and that Natwest has failed to support the proffered calculations with material in proper evidentiary form. The Court agrees.

Although Ross's liability under the Guaranty is clear, the extent of his liability is not. Significantly, the Reeder Affidavit fails to establish that Reeder has any personal knowledge of the administration of RPC's account, and leaves to conjecture the manner in which the records underlying his calculations were compiled and maintained. *See* Affidavit in Support of Judgment of Douglas Reeder, sworn to on October 5, 1988, at ¶ 1. The Court concludes that Natwest has failed to establish the absence of material issues of fact with respect to the outstanding loan balance. Accordingly, its motion for summary judgment with respect to damages is denied.

---

**3.** The proposed amended complaint, moreover, contains no allegation that RPC did, in fact, forego other presently existing sources of funding on the basis of Natwest's representations.

**4.** The Guarantee provides as follows:

The Guarantor waives the right to interpose counterclaims or setoffs of any kind and description in any litigation arising hereunder. Guarantee, annexed as Exhibit "G" to Affidavit of Edward N. Meyer, sworn to June 22, 1989 ("Meyer Aff.").

■ The Court turns to Natwest's motion to strike Ross's jury demand. If, as Ross contends, his jury waiver is unenforceable, he would be entitled to a trial by jury on the issue of damages. *See* Fed. R.Civ.P. 39(a); *Patterson v. Coughlin,* 905 F.2d 564 (2d Cir.1990).

The Guarantee's jury waiver clause provides as follows: "The Guarantor waives the right ... in any litigation with the Bank (whether or not arising out of or relating to any note) to trial by jury." Meyer Aff.Ex. "G". As stated by this court in *N. Feldman & Son, Ltd. v. Checker Motors Corp.:* "Although the right to trial by jury is constitutionally guaranteed, an individual may knowingly and intentionally waive this right...." 572 F.Supp. 310, 313 (S.D.N.Y.1983); *see National Equipment Rental Ltd. v. Hendrix,* 565 F.2d 255 (2d Cir.1977).

New York courts have consistently upheld jury trial waiver provisions in guarantee agreements. *See, e.g., New Jersey Bank, N.A. v. Varano,* 120 A.D.2d 505, 502 N.Y.S.2d 35 (2d Dept.1986); *Chemical Bank v. Summers,* 67 A.D.2d 856, 413 N.Y.S.2d 148 (1st Dept.1979); *James Talcott, Inc. v. Wilson Hosiery Co.,* 32 A.D.2d 524, 299 N.Y.S.2d 460 (1st Dept.1969). In fact, the Court cannot find a single reported New York decision in which a court refused to enforce a jury trial waiver provision in a bank loan agreement or guarantee, and the parties alert the Court to none.

■ The Court finds that Natwest has satisfied its burden of establishing by clear and convincing evidence, Ross's voluntary and intentional waiver of his right to a jury trial. The record establishes that Ross received a bachelor's degree in political science from San Francisco State University and subsequently attended Harvard Business School, receiving an M.B.A. in 1973. At the time Ross signed the Guaranty he was the chief executive officer and majority shareholder of RPC Corporation, a corporation with annual sales of $9,000,000, and had previously had at least six years of experience negotiating complex financial transactions which, in the aggregate, totalled several billion dollars.

Ross was represented by counsel in connection with the loan transaction at issue and, with the assistance of counsel, reviewed and revised various of the Loan Agreements including the Guarantee. On July 20, 1983, Ross's counsel prepared a draft opinion letter in which counsel was prepared to opine as follows: "The Guarantor has all necessary power and authority to execute and perform the Guaranty. The Guaranty has been duly executed and delivered, and constitutes the valid and legally binding obligation of the Guarantor, enforceable in accordance with its terms ..." Meyer Aff.Ex. "F," at ¶ 12. Ross's deposition testimony, moreover, was that he read and understood the Guaranty, and showed it to counsel before signing it. *See* Deposition of Walter L. Ross (undated), Meyer Aff.Ex. "G," at 274, 276.[5] Finally, the waiver provision is set off in its own paragraph less than two inches above the signature line and, like the balance of the Guaranty, is printed in small but entirely legible text. The totality of these uncontradicted facts establishes Ross's knowing and intentional waiver of his right to a jury trial. Ross's arguments to the contrary are frivolous.

■ The Court rejects Ross's contention that the waiver clause does not encompass Ross's counterclaims. The plain language of the clause establishes that Ross "waives the right in any litigation with the Bank ... to trial by jury." The phrase "any litigation" means precisely that, and

---

5. In stark contrast to his deposition testimony concerning his having read and understood the Guarantee and having discussed it with counsel, Ross subsequently testified that he did not read the Guarantee because of its length and fine print, and "because the Guarantee was obviously written in unnecessarily confusing legalistic language...." *See* Affidavit of Walter L. Ross ¶ 6. In view of Ross's unequivocal deposition testimony, Ross's subsequent averments fail, as a matter of law, to create a genuine issue of fact concerning his knowing and intentional waiver of his right to a jury trial. *See Mack v. United States,* 814 F.2d 120 (2d Cir.1987); *Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985).

the Court construes that language to apply to Ross's counterclaims whether or not arising from the Guaranty. *See O'Brien v. Moszynski*, 101 A.D.2d 811, 475 N.Y.S.2d 133 (2d Dept.1984); *Fay's Drug Co. v. P & C Property Coop., Inc.*, 51 A.D.2d 887, 380 N.Y.S.2d 398 (4th Dept.1976); *Leav v. Weitzner*, 268 A.D. 466, 51 N.Y.S.2d 775 (1st Dept.1944).

 The Court also rejects Ross's claim that the Bank has waived its right to enforce the Guaranty's jury trial waiver by failing to timely move to strike. The cases relied upon by defendant are entirely inapplicable here; without exception, those decisions issued at a time when the Courts of New York State maintained separate calendars for jury and non-jury cases. *Compare* Bronx and New York County Supreme Court Rules § 660.4(c) (1983) *with* Uniform Civil Rules for Supreme Court and County Court § 202.3(a) (1989).[6] In each of the New York cases Ross relies upon, had the court granted the motion to strike the jury demand, the case would have been placed at the bottom of the non-jury calendar and plaintiff would have been compelled to wait until the case rose to the top of the non-jury calendar. *See, e.g., Import Alley of Mid–Island, Inc. v. Mid–Island Shopping Plaza, Inc.*, 103 A.D.2d 797, 477 N.Y.S.2d 675 (2d Dept.1984); *Cantor v. 255 West 15th Holding Corp.*, 28 Misc.2d 503, 207 N.Y.S.2d 535 (1st Dept.1960); *Moskowitz v. Keith Sales Corp.*, 99 N.Y.S.2d 173 (Sup.Ct.1948); *Arkin v. Sig Heller Co.*, 197 Misc. 1084, 99 N.Y.S.2d 175 (App.Term 1st

Dept.1950). The delay and resulting unfair prejudice to the plaintiff was at the heart of each of these decisions to deny motions to strike plaintiff's jury demand. *See, e.g., A.J. Fritchy Corp. v. Chase Manhattan Bank*, 36 A.D.2d 600, 318 N.Y.S.2d 369 (1st Dept.1971); *see also Fordham Univ. v. Manufacturers Hanover Trust Co.*, 145 A.D.2d 332, 534 N.Y.S.2d 993 (1st Dept. 1988) (questioning vitality of jury demand cases rendered prior to imposition of New York I.A. system). Ross has failed to show that the bank has been deliberately dilatory or that he will suffer any unfair prejudice stemming from the Bank's motion to strike the jury demand. Accordingly, Natwest's motion to strike Ross's jury demand is granted.

## II. *The Yaeger Action*

The Trustee's claims in this action are based upon the identical transactions and occurrences which are the subject of the Natwest Action. Natwest's defenses of *res judicata*, judicial estoppel and time bar, however, involve events subsequent to RPC's surrender of assets to the Bank which the Court shall briefly summarize.[7]

### A. Background

On June 5, 1986, Natwest representatives met with Ross and his counsel. During the discussion, the Bank declared RPC in default and declared the entire unpaid balance of RPC's loans to be due and payable. The next day, Ross and RPC acknowledged in writing RPC's default under

---

**6.** Prior section 660 provides in pertinent part:

> Where a jury trial has been demanded the action shall be placed on the jury calendar upon payment of the fee prescribed by CPLR 8020(c)(1), (d) and (c) by the party first filing the demand. If the note of issue does not contain a demand for a jury trial and none of the other parties to the action serves and files a demand within fifteen days after service of the note of issue the action shall be placed on the non-jury calendar.

McKinney's 1983 Rules of Court § 660.4(c) (22 NYCRR § 660.4(c)). Present section 202 provides in pertinent part:

> There shall be established for all civil actions and proceedings heard in the Supreme Court and County Court an individual assignment system which provides for the continuous su-

pervision of each action and proceeding by a single judge.

McKinney's 1986 Rules of Court § 202.3(a) (22 NYCRR § 202.3(a)).

**7.** The relevant facts are taken from the parties' statements of undisputed material facts submitted pursuant to Rule 3(g) of the Civil Rules for the Southern District of New York, as well as from the affidavits, depositions and documentary evidence obtained during extensive discovery. In accordance with Rule 3(g), all material facts set forth in the statements which are uncontroverted have been deemed admitted for purposes of the parties' summary judgment motions. The Court resolves all inferences and ambiguities concerning disputed issues of material fact against the movant. *Beacon Enterprises Inc. v. Menzies*, 715 F.2d 757 (2d Cir.1983).

the loan agreements and RPC surrendered its assets to the Bank. Thereafter, the Bank retained an auctioneer and scheduled a public sale.

Prior to the sale, three of RPC's creditors filed an involuntary petition against RPC under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Middle District of North Carolina. The Bank immediately moved for relief from the automatic stay and for permission to conduct the previously scheduled sale of RPC's assets. On June 29, 1986, a hearing was held before the Bankruptcy Court. Ross was present as was RPC counsel.

During the course of the hearing the Bankruptcy Court appointed William L. Yaeger interim trustee. The Bankruptcy Court granted the Bank's application to lift the automatic stay and ordered that the auction of certain of RPC's assets proceed as scheduled. The following day, Yaeger filed his acceptance of appointment as Chapter 7 Trustee.

On July 30 and 31, 1986, RPC's equipment and machinery were sold at auction. Yaeger attended and monitored the auction in accordance with the Bankruptcy Court's directive that he do so. The proceeds of the auction, together with the proceeds of sales before and after the auction, totalling $910,859.21, were paid over to Mr. Yaeger as Trustee.

By orders dated September 16, October 17 and October 24, 1986, the Bankruptcy Court granted Natwest's motions to collect RPC's accounts receivable, to pay the auctioneer its fee of $60,542.96 and to pay over to the Bank the net proceeds of the auction sale, less $265,000 to be held pending further order of the Court, respectively. Neither the Trustee nor any other party opposed these motions or objected to turning over the proceeds to the Bank, nor did the Trustee or any other party challenge the Bank's status as a secured creditor of RPC.

In November 1986, the Bank moved to set off amounts remaining in RPC's checking account. The Trustee opposed the Bank's motion on the sole ground that the funds sought to be set off were monies which constituted proceeds of a pre-paid order and were held by RPC as trustee pending delivery of the goods. On December 19, 1986, the Bankruptcy Court granted the motion.

By order dated September 24, 1986, the Bankruptcy Court authorized the Trustee to enter into an agreement to lease certain of RPC's real property on terms agreed to by the Trustee, the lessee and the Bank. By Stipulation dated February 6, 1987, the Trustee agreed to pay over the rental income from the real property to the Bank, and by Order dated June 24, 1987, the Bankruptcy Court directed that RPC's real property be sold for $635,000, subject to objections from any party in interest. No party in interest, including Mr. Ross who also held a deed of trust on RPC's real property, objected to this sale or to the turnover of the sale proceeds to Natwest.

By application dated March 24, 1987, the Trustee requested that the Court approve a settlement between himself and Natwest concerning the Bank's interest in the sale of certain of RPC's intellectual property. In his application, the Trustee stated that accepting the Bank's offer to pay $40,000 in settlement of the Trustee's claim would be in the best interests of the estate. The Trustee's sole objection to the Bank's request to be paid these proceeds was that the Bank's security interest did not extend to the proceeds of the sale of RPC's intellectual property. By Order dated May 18, 1987, the Bankruptcy Court approved the settlement.

In this action, the Trustee's complaint alleges claims virtually identical to those asserted by Ross in the Natwest Action based upon the same transactions and occurrences underlying the Natwest Action. The parties in this action, however, have conducted extensive discovery. Defendants Markowitz and Grossman move to dismiss the complaint on the grounds that as Natwest employees acting within the scope of their authority, they are not subject to liability on any of the Trustee's claims. Natwest moves for summary judgment dismissing the complaint upon the grounds of res judicata, judicial estoppel,

time bar, and, with respect to the substance of the Trustee's claims, the absence of genuine issues of material fact as to the Trustee's failure to establish any of his claims. The Trustee opposes the motion and cross-moves for partial summary judgment in his favor.

## B. Res Judicata

The Court rejects the Bank's claim that the Trustee's action is barred by the *res judicata* effect of the Bankruptcy Court orders entered in connection with the lift-stay litigation at the inception of the bankruptcy case, and subsequent orders entered in connection with the liquidation of RPC's assets. Central to the application of *res judicata* to bar a previously unlitigated claim is the requirement that the previously unlitigated claim could and should have been raised and litigated in the earlier action. *See Winters v. Lavine*, 574 F.2d 46 (2d Cir.1978). This Court concludes that because the Trustee's lender liability claims could not properly have been raised and fully litigated in connection with, and as a defense to, the Bank's application to lift the automatic stay, the Trustee's failure to raise those claims in connection with the lift-stay litigation does not bar those claims now.

Bankruptcy Code Section 362(e) establishes a summary procedure for obtaining relief from the automatic stay of Section 362(a). The legislative history of Section 362(e) makes clear that counterclaims against a debtor seeking to lift the stay involving largely unrelated matters are not to be handled in the summary fashion that a hearing under Section 362(e) will be; rather, such counterclaims will be the subject of more complete proceedings by the trustee to recover property of the estate or object to the allowance of a claim. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess.

344, *reprinted in* 1978, U.S.Code Cong. & Admin.News 5787, 6300–6301. Consistent with the legislative history, courts have held that "indirect defenses" such as breach of contract and fraud are not properly adjudicated in the course of resolving a creditor's lift-stay motion and should be severed from the lift-stay litigation if raised in an effort to defeat the creditor's motion. *See D–1 Enterprises, Inc. v. Commercial State Bank*, 864 F.2d 36 (5th Cir. 1989); *In re Essex Properties, Ltd.*, 430 F.Supp. 1112 (N.D.Cal.1977);[8] *see also In re Transleisure Corp.*, 41 B.R. 201 (Bkrtcy.E.D.N.Y.1984) (granting relief from automatic stay to secured claimant involves only determination of whether creditor meets statutory requirements, and generally does not directly effect rights of other parties). Counterclaims involving such indirect defenses are generally severed from lift-stay litigation even though they may offset the creditor's entire secured claim. *See* M. Bienenstock, *Bankruptcy Reorganization* 143 (1987) (hereinafter *"Bankruptcy Reorganization"*) (citations omitted).

The Court holds that in this case, the Trustee's lender liability claims against the Bank are not barred by the doctrine of *res judicata.* Had the Trustee raised its lender liability counterclaims during the lift-stay litigation, Bankruptcy Code section 362(e) would have directed the Bankruptcy Court to sever those claims from the issue of the Bank's right to relief from the automatic stay. As in *D–1 Enterprises*, the Trustee's lender liability counterclaims, including his fraud and breach of contract claims, are indirect defenses. *Accord Bankruptcy Reorganization, supra,* at 140–43. Such defenses effect neither the validity of the Bank's security interest in the collateral nor the amount of the outstanding debt.[9] They go, rather, to wheth-

---

**8.** At least one court, however, has held that a debtor's "lender liability" claims, while not properly adjudicated during the course of lift-stay litigation, should be raised and considered at that time. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 420 (3d Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988) (quoting *In re Talley Well*

*Services, Inc.,* 45 B.R. 149, 151 (Bankr.E.D.Mich. 1984)).

**9.** Defenses of nonperfection of the security interest, unconscionability, challenges to the outstanding indebtedness, usury, the statute of frauds and lack of consideration generally constitute "direct defenses" to the lienholder's re-

er the Bank improperly administered its loan to RPC, thereby causing it injury, and involve alleged misconduct in the administration of the loans almost entirely unrelated to the negotiation and execution of the Loan Agreements or the perfection of the Bank's security interest.

■ The provisions of Bankruptcy Rule 7013 governing compulsory counterclaims in adversary proceedings and the cases interpreting that Rule confirm the Court's conclusion that *res judicata* does not serve to bar the Trustee's claims. Significantly, a creditor's motion, pursuant to Section 362(e), for relief from the automatic stay is not an adversary proceeding to which Rule 7013 applies. As the *D–1 Enterprises* court observed:

> It would be odd indeed if a claim that was not required as a compulsory counterclaim by the Bankruptcy Rules and in fact could not be litigated as a defense to the motion for relief from the stay was nonetheless barred by *res judicata* within the same case. Many of the statutes and rules allow more leeway for the debtor-in-possession or trustee in a bankruptcy proceeding to be excused from failure to develop the case as rapidly as possible in order to promote the basic policy of marshalling all the assets for the benefit of creditors. For example, even the compulsory counterclaim rules found in Bankruptcy Rule 7013 include a liberal "escape clause":
>
>> A trustee of a debtor-in-possession who fails to plead a counterclaim through oversight, inadvertence, or excusable neglect, or when justice so requires, may by leave of court amend the pleading, or commence a new adversary proceeding in a separate action.
>
> Bankruptcy Rule 7013. If the "compulsory" counterclaim rule is this generous

to the trustee or debtor, it would be odd indeed for us to hold that the debtor must assert all related claims in a "contested matter" such as a motion to lift the stay, to which the compulsory counterclaim rules do not even apply. That would lay a heavier burden on the debtor to respond with related claims in some unspecified "contested matters" than in "adversary proceedings," an exact inversion of the apparent wishes of Congress.

864 F.2d at 39–40; *see also In re Fonda Group, Inc.,* 108 B.R. 962 (Bkrtcy D.N.J.1989) (facts and legal issues involved in application to reduce creditor's proof of claim, notwithstanding some overlap, differ significantly from those raised by debtor's preference claim, precluding *res judicata* ); *In re Torco Equip. Co.,* 65 B.R. 353 (W.D.Ky.1986), *aff'g in part and rev'g in part,* 39 B.R. 216 (Bkrtcy.W.D.Ky.1984) (debtor not required to bring preference claim as counterclaim to creditor's lift-stay motion). Because the Trustee was not required to interpose, and could not properly interpose, RPC's lender liability claims during the course of the lift-stay litigation, the doctrine of *res judicata* does not operate to bar those claims now.[10]

The Court has reviewed the cases relied upon by the Bank in support of its position to the contrary. Although each of these cases involves a situation where *res judicata* served to bar a debtor's claims, each involves a situation significantly different from that presented here. For example, in *Continental Ill. Nat'l Bank & Trust Co. v. Windham,* 668 F.Supp. 578 (E.D.Tex. 1987), the court held that *res judicata* barred the debtor's principal from asserting various counterclaims against the lender in its suit to recover upon the principal's personal guarantee. A determinative factor in *Windham,* however, was that the

quest for relief from the stay and should be determined as part of the stay litigation. *See Bankruptcy Reorganization, supra,* at 143.

**10.** The Trustee had been appointed during the lift-stay hearing on June 29, 1986, one day before the auction. Though he had access to Ross during the hearing and perhaps thereafter, there does not appear to have been sufficient opportu-

nity to discuss with Ross possible claims against the Bank, much less to plead those claims as an objection to the auction proceeding. RPC's counsel, moreover, had urged the Bankruptcy Judge to permit the auction to proceed immediately; consequently, the Trustee had no practical opportunity to investigate possible claims against the Bank prior to the auction.

lender was one of the petitioning creditors and thus a party to the bankruptcy case which preceded the lender's guarantee action. Relying upon the Bankruptcy Court's order for relief in the bankruptcy case, which rested in part upon a finding that the lender's claim was undisputed, and upon a determination that there was an identity of issues between the validity of the debt owing to the bank and the guarantor's various lender liability counterclaims, the district court found that the necessary elements of *res judicata* had been established. 668 F.Supp. at 580, 583–84.

■ Here, unlike *Windham,* the Bank was not a petitioning creditor. The Bankruptcy Court's order for relief thus does not bind the Trustee with respect to claims or possible claims against the Bank as did the order for relief in *Windham.* Moreover, this Court rejects the theory that consideration and determination of a secured creditor's motion to lift the automatic stay necessarily involves an identity of issues of law or fact identical to those presented by a debtor's garden-variety lender liability counterclaims. The inquiry directed toward whether a creditor is entitled to relief from the automatic stay is narrow in scope.[11] Where, as here, the gravamen of the lender liability claims is fraudulent administration of the loan (as opposed to fraud in the inducement), it is difficult to conclude that such claims arise from the same transaction or occurrence which is the subject matter of lift-stay litigation to determine the extent and validity of creditor's security interest in collateral. *See Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.,* 689 F.Supp. 1340 (S.D.N.Y.1988) (citing *Federman v. Empire Fire & Marine Ins. Co.,* 597 F.2d 798 (2d Cir.1979) (determination of whether claim arises from same transac-tion or occurrence involves consideration of identity of facts between claims, mutuality of proof, logical relation between claims)).

## C. Judicial Estoppel

■ The Court similarly holds that the doctrine of judicial estoppel is insufficient to bar the Trustee's claims. The doctrine precludes a party from framing his pleadings in a manner inconsistent with that taken in another proceeding, and rests upon the principle that a litigant should not be permitted to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise. *Environmental Concern, Inc. v. Larchwood Constr. Corp.,* 101 A.D.2d 591, 476 N.Y.S.2d 175 (2d Dept. 1984) (citations omitted). In short, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *David v. Wakelee,* 156 U.S. 680, 15 S.Ct. 555, 39 L.Ed. 578 (1895). Underlying the doctrine "are general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings." *Arizona v. Shamrock Foods Co.,* 729 F.2d 1208, 1215 (9th Cir.1984) (quoting 1B Moore's Federal Practice ¶ 405[8] ).

■ Upon consideration of the record before it, this Court finds inadequate basis to estop the Trustee from raising his claims or preclude their consideration on the merits. Although the Trustee did not diligently pursue RPC's potential claims against the Bank, the Court does not find that the Trustee remained silent in the face of a duty to disclose potential claims. As set forth above, the Trustee was neither required to plead (nor could he have properly

---

**11.** Bankruptcy Code § 362(d) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided for under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d).

pled) his claims against the Bank during the lift-stay litigation; moreover, this Court is not of the view that a determination of the validity and extent of a secured lender's lien necessarily encompasses a determination that the debtor is without counterclaims based on the lender's alleged wrongful administration of the lending arrangement. The Trustee, therefore, had no duty to raise his claims during the lift-stay litigation or during the liquidation of RPC's assets. The Court therefore finds that the debtor's liquidation, and the Trustee's subsequent payment of proceeds to the Bank, did not impute to the Trustee a duty to raise the lender liability claims which are the subject of this litigation.

 The record, moreover, indicates that the Trustee raised the possibility of asserting such claims early in the bankruptcy case.[12] The Court has considered the significance of the Trustee's January 1989 disclosure that he would not pursue claims against the Bank and concludes that it has no bearing on the application of judicial estoppel in this action. The Bank has failed to establish that the decision not to pursue the litigation against the Bank at that time was attributable to any improper conduct or calculated to obtain some strategic advantage over the Bank. Though reliance is not a necessary element of the doctrine of judicial estoppel, see In re Galerie Des Monnaies of Geneva, Ltd., 55 B.R. 253 (Bkrtcy.S.D.N.Y.1985), aff'd, 62 B.R. 224 (S.D.N.Y.1986), the Bank alleges no change in position or detrimental reliance on the Trustee's advice to the Bankruptcy Court. Rather, the record indicates that the Trustee was following the Natwest Action, in effect adopting a "wait and see" attitude pending its outcome, in light of his inability to finance independent litigation against the Bank.[13] See Yaeger Aff. ¶¶ 4, 5–8.

Although the Bank relies on several decisions in which courts have estopped debtors from raising claims against secured creditors based on failure to disclose claims, each of those cases involve Chapter 11 debtors which failed to disclose potential claims as required by Bankruptcy Code section 1125,[14] and later sought to raise those claims after a plan of reorganization had been either submitted or approved. See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir.), cert. denied, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988); Monroe County Oil Co., Inc. v. Amoco Oil Co., 75 B.R. 158 (S.D.Ind.1987). In contrast, the Trustee disclosed the possibility of asserting claims against the Bank early in the bankruptcy case and a plan of reorganization has been neither submitted nor approved.

## D. Statutes of Limitation

Before addressing the merits of defendants' motions, the Court must first consider defendants' statute of limitations defenses. Defendants argue that the Trustee's second (tortious interference), third (breach of fiduciary obligation), sixth (negligence) and seventh (deceptive business practices)

---

**12.** The Trustee first raised the possibility of such claims upon requesting Bankruptcy Court approval of an assignment of the Estate's claims to Ross in March 1987. Although the application was denied, the Trustee continued to advise the Bankruptcy Court of possible claims against the Bank through January 1989, when he advised the Bankruptcy Court that he would not seek to prosecute the claims directly. See Trustee's Case Interim Report dated January 15, 1989, annexed to affidavit of Edward N. Meyer sworn to on September 18, 1989 ("Meyer Aff.") as Ex. "25".

**13.** One additional reason the Court is reluctant to estop the Trustee here is that the Bank, while perhaps surprised by the Trustee's about-face, has been litigating virtually identical claims in the Ross litigation since 1986. The Bank can hardly claim substantial prejudice or inequity in having to defend these claims.

**14.** Bankruptcy Code § 1125 provides in relevant part:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title [11 U.S.C. §§ 1 et seq.] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information....

11 U.S.C. § 1125(b).

claims are barred by New York's three-year statute of limitations, this action having been commenced on July 29, 1989, over three years from the termination of the Bank's lending relationship with RPC on June 5, 1986. The Court disagrees.

The Court assumes without deciding that, as the Bank suggests,[15] the Trustee's claims accrued on June 5, 1986, upon RPC's surrender of its assets to the Bank. The Court also assumes without deciding that a three-year limitations period applies to the Trustee's Second, Third, Sixth and Seventh claims. *See* Defendants' Reply Memorandum in Support of Motion to Dismiss at 13. The statute of limitations would therefore expire on June 5, 1989. On February 16, 1989, the Trustee requested leave of the Bankruptcy Court to retain special counsel to prosecute this action. The Bank opposed the application and requested an adjournment of the hearing to April 1989. The Bank's application was granted and the hearing was continued to April 3rd. The hearing was again adjourned to May 16th to permit the Trustee to respond to the Bank's objections. By order dated June, 1989, the Trustee's application was granted and on July 28, 1989, the Trustee commenced this action.

 Although the Court rejects the Trustee's argument that the Bank's fraudulent conduct should estop the Bank from raising a statute of limitations defense,[16] the Court holds that the running of the applicable limitations period for these claims was tolled during the period the Bankruptcy Court was considering the Trustee's application to retain special counsel to prosecute this action and the Bank's objections thereto. *See In re Hickman*, 75

N.Y.2d 975, 556 N.Y.S.2d 506, 555 N.E.2d 903 (1990). The Bank's motion to dismiss based upon New York's three-year statute of limitations is denied and the Court turns to the Trustee's substantive claims.

## E. Summary Judgment

### 1. Fraud and Tortious Non–Disclosure

For reasons substantially identical to those warranting dismissal of Ross's fraud counterclaim, *see supra* pp. 663–665, the Court grants Natwest's motion for summary judgment dismissing the Trustee's fifth (fraud) claim as well as the individual defendants' motion to dismiss this claim. Despite extensive discovery, the Trustee has utterly failed to adduce evidentiary facts sufficient to establish the necessary elements of fraud. *See Channel Master Corp. v. Aluminium Ltd. Sales,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957); *see Songbird Jet, Ltd. v. Amax Inc.,* 581 F.Supp. 912 (S.D.N.Y.1984), *aff'd,* 812 F.2d 713 (2d Cir.1987); Fed.R.Civ.P. 9(b).

For the reasons set forth above, *see supra,* pp. 665–666, the Court also grants the Bank summary judgment dismissing the Trustee's eighth claim, based upon tortious nondisclosure.

### 2. The Contract Claim

Ross's contract claim, directed both at the Bank as well as the individual defendants, is based upon breach of the Loan Agreements[17] as well as alleged oral promises made contemporaneously with the execution of the loan agreements as well as oral promises made during the administration of RPC's lending relationship with the

---

**15.** *See* Memorandum of Law in Support of Defendants' Motion to Dismiss and for Summary Judgment and Alternatively to Strike Plaintiff's Jury Trial Demand, at 21–23.

**16.** The record is uncontradicted that, except for those allegations of the Bank's concealment of its decision to terminate its lending relationship with RPC, which this Court has determined nonactionable, *see supra,* pp. 665–666, the actions the Trustee complains of were overt and actual-

ly known to RPC virtually contemporaneously with their occurrence.

**17.** The complaint alleges that the Bank breached the Loan Agreement by requesting that RPC find a new lender, Complaint ¶ 23, reducing RPC's inventory loan, Complaint ¶ 25, establishing a secret reserve on RPC's accounts which caused RPC's checks to bounce, Complaint ¶¶ 27–32, and refusing to make advances which also resulted in RPC's checks bouncing. Complaint ¶¶ 27–32.

Bank. The Bank argues that this claim, alleging "fraudulent" breach of the Loan Agreements as well as breach of various alleged oral agreements, is both contrary to law and barred by the express language of the Loan Agreements. The Court agrees.

### a. Breach of the Loan Agreements

 The Trustee's claim that the Bank breached the Loan Agreements by failing to advance the amounts requested by RPC and by terminating the lending relationship are precluded by the express terms of the Accounts Receivable Loan Agreement. The Agreement provides that the Bank would make advances in its "sole discretion ... up to a sum which shall not exceed" 80% of RPC's eligible receivables. Meyer Aff.Ex. "1," ¶ 1(a). If the Bank did not advance 80% on any receivable, it had the contractual right to do so. The Trustee's claim that the Bank breached the Loan Agreement by deciding to terminate its lending relationship with RPC is similarly barred by the Loan Agreement's Paragraph 1(j) which provides that "this agreement may be cancelled by the Bank at any time without notice ...," whereupon RPC's debts would become payable upon demand. *Id.*

 The Court alternatively holds that, even assuming the Bank had breached the Loan Agreements, RPC, as a matter of law, waived those breaches. It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach. *See New York Tel. Corp. v. Jamestown Tel. Co.,* 282 N.Y. 365, 26 N.E.2d 295 (1940); *Housekeeper v. Lourie,* 39 A.D.2d 280, 333 N.Y.S.2d 932 (1st Dept.1972); *Helsmley–Spear Inc. v. Westdeutsche Landesbank Girozentrale,* 692 F.Supp. 194 (S.D.N.Y.1988). It is equally well-settled that a party to an

agreement who believes it has been breached may elect to continue to perform the agreement rather than terminate it, and later sue for breach; this is true, however, only where notice of the breach has been given to the other side. *See, e.g., Record Club of America, Inc. v. United Artists Records, Inc.,* 643 F.Supp. 925 (S.D.N.Y.1986); *S. Leo Harmonay Inc. v. Binks Manufacturing Co.,* 597 F.Supp. 1014 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985); *see also Holt Marine Terminal, Inc. v. United States Lines,* 472 F.Supp. 487 (S.D.N.Y.1978) (where party gives reason for conduct prior to litigation, he is later estopped from changing positions after litigation has begun).

 Here, the record contains no evidence that RPC ever gave the Bank notice of any breach of the Loan Agreements. From the outset of RPC's relationship with the Bank in August 1983 through its termination in June 1986, RPC never indicated to the Bank or anyone else that it considered the Bank to have been in breach of the Loan Agreements. To the contrary, it was RPC which, on June 6, 1986, before any litigation had commenced, advised the Bank that it, and not the Bank, was in default under the Loan Agreements.[18] Having failed to notify the Bank of any breach of the Loan Agreements and having continued to accept the benefits of the agreement in the form of continuing advances from the Bank, RPC is now precluded from asserting any such breaches. *See Helsmley–Spear,* 692 F.Supp. at 204. Moreover, having acknowledged that it was RPC that defaulted under the Loan Agreements, neither RPC nor the Trustee may now assert that it did not breach these contracts. *See Holt Marine,* 472 F.Supp. at 489; *Rode & Brand v. Kamm Games, Inc.,* 181 F.2d 584 (2d Cir.1950).

### b. Breach of the Alleged Oral Agreements

 The Trustee claims that the Bank breached certain oral promises made

---

**18.** The letter provides in pertinent part:
 We hereby acknowledge that the filing of a federal tax lien against us constitutes a default under these agreements. Consequently, we have decided to, and hereby surrender to you all of the "Collateral" as defined in the aforesaid Agreements for disposition.
June 6, 1986 letter from RPC to Natwest, Meyer Aff. Ex. "17".

to RPC [19] during the administration of its lending relationship with RPC. The Court holds that these alleged oral agreements are barred by the express language of the Loan Agreements. The Term Loan Agreement between the Bank and RPC provides:

> No modification or waiver of or with respect to any provision of this Agreement, the Inventory Agreement, the Term Note, the NBNA Security Documents, and all other agreements, instruments and documents delivered pursuant hereto or thereto, nor consent to any departure by the Borrower from any of the terms or conditions thereof, shall in any event be effective unless it shall be in writing signed by the Bank, and then such waiver or consent shall be effective unless it shall be in writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific instance and for the purpose for which given....

Term Loan Agreement § 9.6, annexed to Meyer Aff. as Ex. "3". The New York General Obligations Law ("G.O.L.") sets forth the effect of this provision:

> [a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

N.Y.G.O.L. 15–301 (McKinney's 1989). An alleged oral agreement subsequent to, and in derogation of, an agreement containing such a "no oral modification" clause can neither modify, nor create a triable issue of fact with respect to, the written agreement. *See Nanuet Nat'l Bank v. Rom*, 96 A.D.2d 898, 466 N.Y.S.2d 68 (2d Dept.1983); *Metropolitan Bank v. Brennan*, 48 A.D.2d 254, 368 N.Y.S.2d 914 (2d Dept.1975). Where there is partial performance of an oral modification sought to be enforced, the Court may consider parol evidence and the conduct of the parties, but only if the partial performance is unequivocally referable to the oral modification. *See Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977).

■ Upon consideration of the alleged oral promises in this case, the Court finds each barred by the "no modification" language of the Term Loan Agreement as well as by operation of G.O.L. 15–301. With respect to the infusion of capital purportedly effectuated in connection with a December 16, 1985 agreement to extend RPC's financing through December 1986, the Court reaffirms its determination in *Natwest II* that "since [RPC's] only conduct was injecting more money into RPC, there are too many possible explanations for this behavior to meet either the partial performance or equitable estoppel exceptions set out in *Rose*." *Natwest II*, at 8. The Court holds that Ross's testimony that the $100,000 and $30,000 payments were made in connection with the purported oral agreement, without more, fails as a matter of law to establish partial performance unequivocally referable to the oral modification. The alleged oral agreement is thus barred by the express language of the Loan Agreement.

■ With respect to the alleged May 6, 1986 agreement purportedly granting a six-month moratorium on reduction of RPC's inventory loan, the Trustee has failed to present evidence sufficient to establish any alleged partial performance of the agreement unequivocally referable to the oral modification. This agreement is barred by the Loan Agreement's "no modification" clause.

■ The alleged June 5, 1986 agreement to pay certain payroll expenses in

---

**19.** The oral promises the Bank is alleged to have made are (a) a December 16, 1985 agreement to provide financing for RPC through December 1986 in exchange for Ross' investment of additional capital and RPC's payment of a $30,000 annual "collateral management fee," *see* Complaint ¶¶ 35–38, (b) a May 1, 1986 agreement granting RPC a six-month moratorium on the inventory loan reduction program in exchange for RPC's rescheduling its trade debt and securing additional capital, *see* Complaint ¶¶ 39–40 and (c) a June 5, 1986 agreement regarding payment of certain payroll expenses and disposition of RPC's assets in exchange for RPC's surrender of the assets. *See* Complaint ¶¶ 46–49.

exchange for RPC's surrender of its assets is also barred by the "no oral modification" language of the Loan Agreements since there is no evidence of partial performance unequivocally referable to the oral modification. Under no circumstances can the peaceful surrender of RPC's assets to the Bank be considered partial performance since the surrender of assets was made pursuant to RPC's own declaration of default under the Loan Agreements and was itself RPC's express obligation under the Loan Agreements. *See* Security Agreement annexed to Meyer Aff. as Ex. "4," at §§ 5(b), 8–9. It is also evident that because RPC was obligated to turn over to the Bank its assets in the event of a default, a subsequent promise to do so is insufficient consideration for the Bank's promise to pay certain payroll expenses.

In view of the substance of the alleged oral agreements, the Court rejects as frivolous the Trustee's argument that these agreements were not mere modifications to the Loan Agreements but rather "were separate, additional agreements." Not one of these agreements has any significance except in the context of, and in relation to, the Loan Agreements. Moreover, the clear objective of each of the alleged agreements is to realize a forbearance by the Bank of one or more of its rights under the Loan Agreements.

### 3. The Negligence Claim

The Trustee's sixth (negligence) claim fails as a matter of law. Since the Bank did not breach the Loan Agreements, the Trustee fails to state a claim for their negligent performance. Assuming, *arguendo*, that the Bank had breached the Loan Agreements, the Trustee has failed to demonstrate the existence or breach of an obligation independent of the Loan Agreement but "springing" from it, so as to warrant liability in tort. *See Luxonomy Cars, Inc. v. Citibank, N.A.,* 65 A.D.2d 549, 408 N.Y.S.2d 951 (2d Dept.1978); *see also Burlew v. American Mut. Ins. Co.,* 99 A.D.2d 11, 471 N.Y.S.2d 908 (4th Dept.), *aff'd,* 63 N.Y.2d 412, 482 N.Y.S.2d 720, 472 N.E.2d 682 (1984).

The Court also rejects the Trustee's claim that the Bank disposed of RPC's assets in a commercially unreasonable and, hence, negligent, manner. Under the Uniform Commercial Code, a secured party shall dispose of collateral in a "commercially reasonable" manner. *See* N.Y.U.C.C. § 9–504(3) (McKinney's 1990). U.C.C. § 9–507(2) provides in pertinent part:

> A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable....

Here, the Bankruptcy Court expressly approved the method, manner, time and place of the sale at a hearing at which the Trustee, Ross and RPC's counsel were present. There were no objections to any aspect of the sale and, in fact, RPC's counsel urged the sale to go forward as planned. After the sale, neither RPC nor the Trustee voiced any objection to the terms of the auction or the extent of the proceeds realized, nor did they object to the Bankruptcy Court's entry of an order directing the turnover of the auction proceeds to the Bank. These events unequivocally constitute judicial approval of the sale of RPC's assets sufficient to deem the commercial reasonableness of that sale conclusive under U.C.C. § 9–507(2). Moreover, the Trustee's allegations of commercial unreasonableness are so contradictory to RPC's position with the Bankruptcy Court on this issue that the Trustee is estopped from challenging the commercial reasonableness of the sale here. Most noteworthy is the following exchange between Mr. Bentley, RPC's counsel, and the Bankruptcy Court during the pre-auction hearing:

> MR. BENTLEY: Yes, Your Honor. Thank you. *RPC Corporation very much wants the sale to take place.* Mr. Wallace [Mr. Ross], the Chairman, is here today, and has personally invested a lot of his energy in trying to drum up interest in the sale. There are a number of perspective [sic] purchasers coming from foreign countries. Some of them

have already arrived in the vicinity and are on site.

I think it is also important to note that there is a chance that the intellectual property could bring a substantial value, and whoever purchases that property has until August 10 to submit bids for up to sixteen million dollars worth of contracts that are going to be let. *So with us time is of the essence.*

\* \* \* \* \* \*

THE COURT: So you will not have a viable company to operate anymore after the sale; isn't that correct?

MR. BENTLEY: That's correct.

THE COURT: Are there any creditors or interested parties in the courtroom that have any objections to the sale going forward tomorrow? That's the first hurdle we need to get over.

(No response)

THE COURT: The Court is going to order that the sale proceed tomorrow. Now the Court normally doesn't like to move this quickly after a case is filed and have a sale this quickly, but there are no objections, and everybody seems to think this is the best procedure, then the Court will allow it.

Transcript from Hearing on Motion of Natwest USA for Relief from Stay, July 29, 1989 at 8–9 (emphasis added). Later, the Trustee advised the Bankruptcy Court that he had no objection to turning over the proceeds of the auction sale to the Bank, and the Bankruptcy Court ordered such a turnover. On the basis of these representations to the Bankruptcy Court, the Trustee is now estopped from an abrupt and belated attempt to unwind the auction. *See Environmental Concern, Inc. v. Larchwood Const. Corp.,* 101 A.D.2d 591, 476 N.Y.S.2d 175 (2d Dept.1984) (citations omitted).

### 4. The Tortious Interference Claim

■ The Trustee's second (tortious interference) claim fails as a matter of law. In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show

the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are dishonest, unfair or in any other way improper.... If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct.

*PPX Enterprises Inc. v. Audio Fidelity Enterprises, Inc.,* 818 F.2d 266, 269 (2d Cir.1987) (citations omitted) (emphasis in original); *see Demalco Ltd. v. Feltner,* 588 F.Supp. 1277 (S.D.N.Y.1984); *see also Strapex Corp. v. Metaverpa N.V.,* 607 F.Supp. 1047 (S.D.N.Y.1985) (interference must involve existing or potential contractual relationship with identifiable third-party); *Tappan Motors, Inc. v. Waterbury,* 65 Misc.2d 514, 318 N.Y.S.2d 125 (Sup.Ct.West.Co. 1971) (same).

The Trustee's claim for tortious interference fails because of the complaint's allegations, confirmed by Ross's uncontradicted averments, that the Bank and its officers acted to "enhance the Bank's position," Complaint ¶ 37, "with the intention of favoring the Bank's own claims against RPC over the rights of RPC and its creditors, and over the rights of Ross as President of RPC, major shareholder, and guarantor." Complaint ¶ 64. Because the Trustee alleges that the Bank's conduct was motivated by economic factors and not solely by malice, he fails to state a claim for tortious interference. *See Strapex,* 607 F.Supp. at 1050. The Trustee also fails either to allege, or provide evidentiary support for, the existence of the other requisite elements of a claim for tortious interference, i.e., causing a breach of an existing or potential contract with an identifiable third-party, resulting in damages. *See Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832 (2d Cir.1980). Accordingly, the Trustee's tortious interference claim is dismissed.

### 5. Breach of Fiduciary Duty

■ The Trustee's breach of fiduciary duty claim is also dismissed. As stated by

this Court in *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.:*

> New York law is clear that a fiduciary relationship exists from the assumption of control and responsibility, and is founded upon trust reposed by one party in the integrity and fidelity of another.... Moreover, courts have rejected the proposition that a fiduciary relationship can arise between parties to a business transaction.

601 F.Supp. 770, 772 (S.D.N.Y.1985) (citations omitted). Where parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances. *See, e.g., Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729 (2d Cir.1984); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112 (2d Cir.1984); *accord Price v. Wells Fargo Bank,* 213 Cal.App.3d 465, 261 Cal.Rptr. 735 (1989), *modified on other grounds,* 1989 WL 98058, 1989 Cal. App. LEXIS 1015 (1989).[20]

■ The Trustee has failed to suggest special circumstances that would give rise to a fiduciary relationship between the parties here, and the undisputed facts establish that none existed. The Trustee admits that no New York court "has addressed the issue of whether a fiduciary relationship exists under the circumstances [presented here]." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and for Summary Judgment at 78–79. The trustee's concession does not go far enough as New York courts have *refused* to find such a relationship under circumstances roughly similar to those presented here. *See, e.g., Murray Glick Datsun,* 601 F.Supp. at 772. The Court rejects the contention that such a relationship arose from the structure of the parties agreement, which enabled the Bank to make advances against eligible receivables in its discretion. *See Riquelme Valdes v. Leisure Resource Group, Inc.,* 810 F.2d 1345 (5th Cir.1987).

### 6. Breach of Duty of Good Faith

■ In both *Natwest I* and *Natwest II,* this Court, quoting *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983), held that "no obligation [of good faith] can be implied ... which would be inconsistent with other terms of the contractual relationship." 676 F.Supp. at 54; *Natwest II* at 9. In so holding, this Court followed the New York Court of Appeals mandate that although the obligation of good faith is implied in every contract, it is the terms of the contract which govern the rights and obligations of the parties. The parties' contractual rights and liabilities may not be varied, nor their terms eviscerated, by a claim that one party has exercised a contractual right but has failed to do so in good faith. *See Murphy,* 461 N.Y.S.2d at 232, 448 N.E.2d at 86; *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 537 N.Y.S.2d 787 (1988); *Sharma v. Skaarup Ship Management Corp.,* 699 F.Supp. 440 (S.D.N.Y.1988).

■ Because the covenant of good faith implied in every contract cannot frustrate the operation of an express term of an agreement bargained for at arms length, the defendants are entitled to summary judgment dismissing the complaint's fourth (breach of good faith dealing) claim. Under the Loan Agreements, the Bank was not obligated to advance any particular sums to RPC nor was it bound to finance RPC for any determinate period. Paragraph "1(a)" of the Accounts Receivable Loan Agreement states that the Bank would, in its sole discretion, make available to RPC advances totalling up to 80% of eligible receivables. *See* Meyer Aff.Ex. "1". Paragraph "1(j)" of that agreement provides that the agreement "may be cancelled by the Bank, at any time without notice ..." *Id.* A similar discretionary advance provision is contained in the Inventory Loan Agreement at Paragraph "1". The Loan Agreements therefore establish

---

**20.** The Trustee's own lawyer has interpreted the California Court of Appeals decision in *Price* as rejecting the theory that any special duty arises in the ordinary lending relationship. *See* 3 Lender Liab.L.Rep. No. 5 at 5 (WG & L) (H. Chaitman Nov.1989).

that the Bank was contractually entitled to sever its lending relationship with RPC at its discretion, for any reason or no reason at all. Accordingly, the Court refuses to imply an obligation of good faith inconsistent with other express terms of the parties contractual relationship.

The Trustee urges that the Sixth Circuit's decision *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985), mandates a contrary result. The Court disagrees. In *K.M.C.*, the Court of Appeals for the Sixth Circuit held that a "discretionary advance clause," similar to that included in the Loan Agreements, would "leave K.M.C.'s continued existence entirely at the whim or mercy of Irving, absent an obligation of good faith performance." *Id.* at 759. With respect to what would constitute "good faith performance" of Irving's right to terminate its financing of the debtor under the "discretionary advance clause," the Court of Appeals focused on the element of notice:

> Logically, at such time as Irving might wish to curtail financing K.M.C., as was its right under the agreement, this obligation to act in good faith would require a period of notice to K.M.C. to allow it a reasonable opportunity to seek alternative financing, absent valid business reasons precluding Irving from doing so....

*Id.* (citing *Wells v. Alexandre*, 130 N.Y. 642, 29 N.E. 142 (1891) [if notice was requisite to its proper execution, a covenant to give such notice will be inferred, for any other construction would make the contract unreasonable, and place one of the parties entirely at the mercy of the other] and comparing U.C.C. § 2–309 comment 8 [the application of principles of good faith and sound commercial practice normally call for such notification of the termination of an ongoing contractual relationship as will give the other party reasonable time to seek a substitute arrangement] ). The Court also held that Irving Trust had a duty to act in good faith in exercising its

right to demand payment of the loan under U.C.C. § 1–208. *Id.* at 760.

With respect to this latter holding, the Sixth Circuit's decision in *K.M.C.* is in conflict with the New York Court of Appeals' decision in *Murphy, supra,* 461 N.Y.S.2d at 232, 448 N.E.2d at 86 and has been widely criticized for having overlooked the Comment to U.C.C. § 1–208. *See, e.g., Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir.1990); *Spencer Cos., Inc. v. Chase Manhattan Bank, N.A.,* 81 B.R. 194 (D.Mass.1987). The Comment unequivocally indicates that § 1–208 has no application to demand instruments.[21] Accordingly, this Court declines to follow *K.M.C.* to the extent that the obligation of good faith performance enunciated there would imply an obligation of good faith upon the Bank inconsistent with the express terms of its contractual relationship with RPC.

■ With respect to the issue of proper notice, the Court holds that *K.M.C.* has only marginal applicability to this case. Material to the Sixth Circuit's decision in *K.M.C.* was Irving's failure to give K.M.C. even brief notice before accelerating the outstanding loan balance. The court emphasized this failure and stated "[i]f Irving had given K.M.C. 30 days, seven days, even 48 hours notice, we would be facing a different situation. However, no notice was given." *K.M.C.,* 757 F.2d at 763.

Here, unlike *K.M.C.*, the Bank did not abruptly terminate its lending relationship with RPC; rather, according to Ross's own account of the events, in March 1985 the Bank notified RPC of its desire to terminate the lending relationship, acknowledged that RPC would require six to nine months to obtain alternate financing, and advised RPC that it must find a new lender "within a reasonable time." Affidavit of Walter L. Ross, dated August 11, 1989 (unsworn) (the "Ross Aff."), ¶ 24. Ross, moreover, admits that during the months

---

**21.** The Comment to U.C.C. § 1–208 provides:
Obviously, this section has no application to demand instruments or obligations whose very nature permit call at any time with or without reason.

N.Y.U.C.C. § 1–208 comment (McKinney's 1964).

following the March 1985 meeting with the Bank he attempted to secure new financing for RPC, *id.* ¶ 24, but that "RPC could not possibly obtain a commitment for new financing until after September 1985 at the earliest, when it would receive its audited financial statement for the fiscal year ending June 30, 1985." *Id.* ¶ 27. This inability to obtain alternate financing, according to Ross, was "because RPC was a start-up company with very little operating history...." *Id.* As an incentive to find other financing under these circumstances the Bank, according to Ross, also indicated its intent to exercise its right under the Loan Agreements to reduce the Inventory Loan by $25,000.00 per month. *Id.* These admissions indicate that rather than terminate the lending relationship without notice, arbitrarily or capriciously call a demand obligation without notice, or refuse to advance an amount without notice, the Bank forbeared from exercising its ·full panoply of rights under the Loan Agreements in consideration of RPC's expressed concern over finding alternate financing. The uncontradicted facts, including, significantly, Ross's own testimony, establish, as a matter of law, reasonable notice to RPC of the Bank's desire to have RPC obtain alternate financing, as well as the Bank's accommodation of RPC's request that it be given a reasonable time to do so.

### 7. Deceptive Business Practices

■■■■■ For the reasons set forth in Part I, *supra*, and in the Magistrate Judge's Report in the Ross Action, the Court grants the Bank's motion for summary judgment dismissing the Trustee's deceptive business practice claim. The Trustee's claim under Section 75–1.1 of the General Statutes of North Carolina is also dismissed, as New York law applies to this case.[22]

### CONCLUSION

With respect to the Natwest Action (86 Civ. 6277) for the reasons set forth above,

Ross's motion for reargument and reconsideration of the Court's August 1988 Memorandum Opinion and Order (*Natwest II*) dismissing the first, third and fourth counterclaims is denied. Ross's motion for leave to serve an amended counterclaim is denied in its entirety and his counterclaims are dismissed with prejudice. Plaintiff's motion to strike Ross's jury demand is granted. The matter is hereby referred to a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for a report and recommendation as to damages.

With respect to the Trustee's Action (89 Civ. 4959), defendant Roy Grossman's and Murray Markowitz's motions, pursuant of 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing the amended complaint are granted, and the complaint is hereby dismissed as against these defendants. The Bank's motion, pursuant to Rule 56, for an order granting the Bank summary judgment dismissing the amended complaint is granted in its entirety and the amended complaint is hereby dismissed. The Trustee's cross-motion for partial summary judgment is denied. The Trustee's motion for consolidation of the Trustee's and Natwest Actions is denied as moot.

SO ORDERED.

### APPENDIX

United States District Court

Southern District of New York

National Westminster Bank
USA, Plaintiff,

against

Walter R. Ross, Defendant.

86 Civ. 6277 (SWK)

### REPORT AND RECOMMENDATION

TO THE HONORABLE SHIRLEY WOHL KRAM, U.S.D.J.:

---

**22.** The Trustee's complaint itself alleges that "the causes of action arose [within the Southern District of New York]." Complaint ¶ 6. Moreover, the Term Loan Agreement contains a choice of law clause which provides that "[t]his agreement ... and the rights and obligations the parties hereunder ... shall be construed and interpreted in accordance with the laws of the State of New York." Term Loan Agreement, Meyer Aff. Ex. "3," at § 9.11.

Defendant moves to amend his answer pursuant to Fed.R.Civ.P. 15(a) to add to and clarify his counterclaims, to assert a consumer fraud counterclaim and to add Roy Grossman ("Grossman") and Murray Markowitz ("Markowitz"), account officers at plaintiff National Westminster Bank USA (the "Bank"), as third-party defendants. According to defendant, newly discovered evidence, withheld during most of the pretrial period, prompted the motion.

*Background:*

The facts of this case are set forth in Judge Kram's opinion of November 20, 1987, (*Natwest I*), familiarity with which is assumed. In brief, this action arises out of a $4,000,000 1983 loan agreement ("the loan") between the RPC Corporation ("RPC") and the Bank that defendant, principal shareholder and president of the RPC, guaranteed as part of a leveraged buyout. On June 6, 1986, RPC defaulted on the loan. Defendant peacefully surrendered RPC's assets to the Bank, who sold them at auction. Two months later, with over $1,500,000 still unpaid, the Bank sued defendant as guarantor.

Defendant, in his original answer, asserted counterclaims for breach of contract, usurpation of defendant's powers as president of RPC,[1] breach of fiduciary duty, breach of duty to deal in good faith, fraudulent inducement, loss of employment and intentional infliction of economic and emotional harm. According to defendant, Bank vice president John Gluckin ("Gluckin") promised, at the time of the loan, to provide RPC with long term financing. Original Counterclaim at ¶ 2. In March 1985, Grossman told defendant that the Bank had limited its target loan market to companies based within 150 miles of New York and, therefore, wanted RPC, located in North Carolina, to find another lender. *Id.* at ¶¶ 10–11. Grossman told defendant that if RPC did not move from the Bank within a reasonable time, the Bank would "get rough." *Id.*

Defendant described how the loan officers allegedly harassed RPC to force it out of the Bank. For instance, in 1984 the Bank asked RPC, in return for reducing its monthly loan payments, to find additional financing and suggested Richard Tikijian, of the M.J. Williams Company of New York ("M.J. Williams"), a close Gluckin associate, as a good source. *Id.* at ¶¶ 7, 9. The next year, following the resignation of Gluckin amid accusations of credit fraud and money laundering, the Bank called in all loans associated with Tikijian. *Id.* at ¶ 9.

Grossman, in February 1985, the original answer continues, reduced the Bank's advance rate on inventory financing by $25,000, as an incentive for RPC to seek alternate financing. *Id.* at ¶ 12. Defendant alleged that seven months later Markowitz secretly instituted a reserve policy whereby the Bank froze RPC's account for 20 days prior to the due date of RPC's monthly loan payments. *Id.* at ¶¶ 17, 20. As a consequence, between October 1985 and June 1986, the Bank refused to honor 118 checks drawn on RPC funds, creating turmoil and loss of confidence among RPC's employees and suppliers. *Id.* at ¶¶ 18–19; 22.

Defendant also claims that, despite frequent phone calls, Goodman and Markowitz refused to tell defendant whether an $82,711 customer check RPC deposited on May 5, 1986 cleared until May 30, 1986, the date RPC's monthly loan payment was due. *Id.* at ¶ 28. Bank records show that the check cleared on May 7, 1986. *Id.* Defendant alleged that the Bank's failure to disclose this information forced him to commit an additional $50,000 of his personal funds to RPC. *Id.* at ¶ 29.

In her August 25, 1988 decision (*Natwest II*), Judge Kram granted the Bank summary judgment on its claim for relief and dismissed the counterclaims for breach of contract, breach of fiduciary duty and breach of duty to deal in good faith. *Natwest II*, at 3–5; 7–9. Subsequently, defendant moved for reconsideration of *Natwest II;* that motion is now pending.

---

**1.** The amended answer retitles the usurpation action as one for interference. *See* Amended

Answer ¶¶ 60–62.

The parties began discovery in November 1988. For the next five months, defendant deposed 13 bank officials and reviewed 8800 documents. At a February 20, 1989 conference before Judge Kram, defendant notified the Bank that he would file an amended answer and, at a conference before the undersigned, one month later, indicated that the amended answer would assert counterclaims against Goodman and Markowitz in their individual capacities. We set a discovery cutoff date of April 30, 1989. A final deposition took place on May 31, 1989 and the Bank produced additional documents for defendant in late June.

Defendant's proposed amended counterclaims restate his claims for breach of contract, breach of fiduciary duty, breach of duty to deal in good faith and fraud and contains a more detailed statement of facts in several respects. First, the statement of facts discusses the loan agreement and the negotiations surrounding it in greater detail. Amended Answer ¶ 7–11. Defendant now alleges Gluckin specifically promised that the Bank would extend asset based financing to RPC for five years. *Id.* at ¶ 9. Defendant also claims he relied on his belief that the Bank would deal fairly and honestly with RPC. *Id.* at ¶ 14. Second, the statement of facts alleges, for the first time, that RPC had to rely on the Bank for all of its capital, RPC's customers paid the Bank directly and RPC calculated its line of credit pursuant to instructions sent from the bank. *Id.* at ¶ 15.

Third, defendant alleges that in October 1984 the Bank decided to force RPC to seek an alternate lender. *Id.* at ¶ 21. In December 1984, Markowitz asked defendant to testify in the bankruptcy proceedings of M.J. Williams, the corporation Tikijian worked for. *Id.* at ¶ 22. Defendant contends that because the Bank needed his testimony they did not inform him of their plans to terminate the Bank's relationship with RPC. *Id.* Fourth, defendant noted that the Bank's refusal to honor RPC's

checks led to two arrests of RPC's comptroller, Reggie Dunn ("Dunn"), on felony charges. *Id.* at ¶ 33. According to defendant, when Dunn and defendant told Markowitz of the arrests, he laughed. *Id.* Fifth, to buttress his claim that the Bank violated a June 5, 1986 oral agreement regarding the sale of RPC's assets, defendant now alleges that RPC's assets as of June 5, 1986 would have covered the outstanding loan had they been sold in a commercially reasonable manner. *Id.* at ¶ 51.

The proposed amended answer adds two new counterclaims: consumer fraud under New York General Business Law of New York § 349(a) ("§ 349(a)"), and, the so-called tort of non-disclosure, based on defendant's reliance on prior representations of the Bank.[2] *Id.* at ¶¶ 73–75; 76–79. As noted, the amended answer also adds Goodman and Markowitz as defendants in each counterclaim.

*Discussion*

a. Undue Delay

The standards governing the amendment of pleadings are well known. As stated in *Richardson Greenshields, Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987):

Fed.R.Civ.P. 15(a) provides that leave to amend a pleading 'shall be freely given when justice so requires.' A motion to amend should be denied only for such reasons as 'undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.' *State Teachers Retirement Rd. v. Flour Corp.*, 654 F.2d 843, 856 (2d Cir.1981). Furthermore, '[m]ere delay ... absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend.' *Id.*; see also *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir.1973) (Lumbard, J.) ('we know of no case where delay alone was deemed sufficient grounds to deny a Rule 15(a) motion to amend').

*See also Leonelli v. Pennwalt Corporation*, 887 F.2d 1195, 1198 (2d Cir.1989);

---

**2.** The non-disclosure claim merely restates defendant's fraud claims and we treat it as part of his fraud counterclaim.

*Ragin v. Harry Macklowe Real Estate Co., Inc.,* 126 F.R.D. 475, 478 (S.D.N.Y.1989).

The Bank first objects to the amended answer on the grounds that it is untimely and prejudicial. According to the Bank, defendant knew of the facts underlying his amended answer in 1986, when he filed his answer. Nevertheless, defendant did not amend his counterclaims until discovery had closed. Therefore, the Bank says, defendant's motion should be denied as untimely.

As the Bank argues, in 1986 defendant had the knowledge needed to add Goodman and Markowitz as parties and pursue the consumer fraud claims. Though defendant counters that the consumer fraud counterclaim and the addition of Goodman and Markowitz arose from newly discovered evidence, he provides no specifics. Furthermore, the allegations concerning the meetings between defendant, Goodman and Markowitz are recycled, almost word-for-word, from the original answer. *Compare* original answer ¶¶ 10–11; 14–15; 24–25; 27; 30–32; 39 *with* amended answer at ¶¶ 38; 41–43; 52–53; 58. One assumes that if new evidence led defendant to add Markowitz and Grossman to the amended answer, that new evidence would relate to them. Nonetheless, defendant leaves the allegations regarding his meetings with the two loan officers unchanged in the amended answer.

Likewise, defendant has not explained why new evidence led him to add a consumer fraud counterclaim. To make out a claim under § 349(a), a party must allege "deceptive acts or practices in the conduct of business." The amended answer does not allege any new "deceptive acts or practices" on the part of the Bank; it merely expands on the practices defendant discussed in the original counterclaim. Defendant has not cited a change in the consumer fraud law that would justify waiting until 1989 to file a claim.

In addition, most of the factual changes in the amended answer involved information known to the defendant in 1986. The background of the loan negotiations, the mechanics of the Bank's financing scheme, Markowitz's reaction to the arrest of Dunn, and the value of RPC at the time of default, four of the major changes in the amended answer, were within defendant's personal knowledge before the lawsuit began. Only one change, that the Bank decided in October 1984, rather than February 1985, to close RPC's account, appears to have been learned through discovery.

Although defendant could have filed the substance of the amended counterclaims at the time of his answer, delay alone is not a sufficient reason to reject an amendment. *United States v. Continental Illinois Bank and Trust Company of Chicago,* 889 F.2d 1248, 1254 (2d Cir.1989); *Richardson,* 825 F.2d at 653, n. 6; *State Teachers Retirement Board v. Fluor Corp.,* 500 F.Supp. 278, (S.D.N.Y.1980), *aff'd in part, rev'd in part on other grounds,* 654 F.2d 843 (2d Cir.1981) (mere fact of delay insufficient for denial absent prejudice).

The Bank, however, argues that defendant, who owes the Bank $1,500,000 pursuant to Judge Kram's *Natwest II* decision granting the Bank summary judgment on the debt, filed the amended answer primarily as a delaying technique. Defendant may benefit from delay, but the Bank has presented no evidence to support its allegations of bad faith.

The Bank also argues that granting the amendment will prejudice it by leading to a new round of discovery. Goodman and Markowitz, the bank observes, will be free to select their own counsel, make their own motions and take their own discovery. The Bank does not say, however, that either of the other two changes—the consumer fraud counterclaim and the more detailed statement of facts—will create additional discovery problems.

The addition of the two parties does not establish prejudice. For one thing, even if Goodman and Markowitz retain their own counsel, which is unlikely, the claims defendant seeks against them are identical to those filed against the Bank. In addition, the Bank deposed defendant

for five days; that deposition should provide Goodman and Markowitz with all the information they need about defendant. In any event, to succeed on this motion, the non-moving party must do more than assert the possibility of future discovery. *Middle Atlantic Utilities Co. v. S.M.W. Development Corp.*, 392 F.2d 380, 385 (2d Cir.1968); *see also Continental Illinois Bank,* 889 F.2d at 1252; *WIXT Television, Inc. v. Meredith,* 506 F.Supp. 1003, 1010 (S.D.N.Y.1980). It must show that new discovery will create additional difficulties, *id.* at 386, such as bringing complex legal and factual issues into the case. *Dravco Corp. v. Ohio Power Co.,* 100 F.R.D. 307, 308 (N.D.Ohio 1983) (refusal add nine new counterclaims, some of which would require plaintiff to change his theory of the case); *Fair Housing Development Fund v. Burke,* 55 F.R.D. 414, 420 (E.D.N.Y.1972) (refusal to add 12 unincorporated villages to exclusionary zoning suit because of complex legal and factual issues created). Moreover, the Bank has not indicated why Goodman and Markowitz will need additional discovery. Nor has it asserted that the amendments will create complex legal or factual issues. In short, the Bank has not shown prejudice.

b. Futility

█ The Bank asserts that defendant's counterclaims are futile. A motion to amended will be denied if the amendment would be futile. *Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Leonelli,* 887 F.2d at 1198. Thus, the court will not grant leave when the amended pleading cannot survive a motion to dismiss. *Freeman v. Marine Midland Bank,* 494 F.2d 1334, 1338 (2d. Cir. 1973); *Nardella v. Braff,* 621 F.Supp. 1170, 1172–73 (S.D.N.Y.1985).[3] Because defen-

dant has amended the facts supporting all of the counterclaims, we must evaluate each of his claims for futility, even though the essence of these claims are unchanged and the Bank did not moved to dismiss in the past.

1. *Law of the Case*

Three of defendant's counterclaims— breach of contract, breach of fiduciary duty and breach of duty to deal in good faith— have already been dismissed by Judge Kram in *Natwest II.* That decision constitutes the law of the case and defendant cannot relitigate those claims absent compelling circumstances. "The doctrine of law of the case 'posits that when a court decides upon a rule of law that decision should continue to govern the same issues in subsequent stages in the same case.' " *United States v. Yonkers Board of Education,* 856 F.2d 7, 11 (2d Cir.1988) (*quoting Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318). A court should depart form the rule of the case "only for convincing reasons." 1B Moore's Federal Practice, ¶ 0.404 [4.—1] (2d Ed.1988); *Dale v. Hahn,* 486 F.2d 76, 80 (2d Cir.1973); *Orshan v. Anker,* 550 F.Supp. 538, 540 (E.D.N.Y.1982) (new evidence alone not sufficient reason for rejecting the doctrine). Thus, we recommend that the motion to amend on these claims be denied without prejudice to renewal in the event defendant prevails on reconsideration.

2. *The Interference Claim*

Defendant asserts a claim for interference. *See* Amended Answer ¶¶ 60–62. The amended answer, though, does not allege the nature of the interference. To make out a claim for contractual interference under New York law,[4] defendant must allege (1) the existence of a valid contract,

---

3. In evaluating the amended counterclaim, the standards of Fed.R.Civ.P. 12(b)(6) apply and the court will "assume the truth of the factual allegations contained in the [counterclaim], and the motion [to strike the amendments] must be denied unless no reasonable interpretation of the facts can support the ... claim for relief." *Nardella,* 621 F.Supp. at 1172 fn. 2 (*citing Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972)).

4. Neither side raised the issue in their motion papers, but the Bank and defendant agreed to determine their rights and liabilities under the guaranty agreement in accordance with New York law. Both parties rely heavily on New York cases. Therefore, we assume New York law applies.

(2) that the Bank knew of that contract and (3) intentionally procured the breach (4) causing defendant damages. *Martin Ice Cream Co. v. Chipwhich Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983); *In re Rubin Bros. Footwear*, 73 B.R. 346, 357–58 (S.D.N.Y.1987). The allegations contained in the Amended Complaint do not meet this test.[5] Paragraph 22 mentions that the Banks refusal to honor checks led to "loss of confidence among employees and suppliers," but does not allege that the Bank's action lead to the breach of any particular employment or supply contracts. Similarly, though ¶¶ 17–20 aver that the Bank told RPC to seek a loan from Tikijian and then later called in all loans associated with him, defendant does not allege that the Bank's actions invalidated any contractual agreement between RPC and Tikijian.

Defendant's brief indicates that his interference claims are based on interference with the pursuit of his business and business relationships. In New York, a party may sue for the tortious interference with beneficial business relations, business advantage or economic advantage. *PPX Enterprises v. Audiofidelity Enterprises*, 818 F.2d 266, 269 (2d Cir.1987); *see also Sommer v. Kaufman*, 59 A.D.2d 843, 399 N.Y.S.2d 7, 8 (1st Dep't 1977).[6] These

claims have a high scienter requirement; either the tortfeasor's actions must be solely motivated by malice or the means used must be criminal or fraudulent. *PPX Enterprises*, 818 F.2d at 269; *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832, 838 (2d Cir.1980); *see Beardsley v. Kilmer*, 236 N.Y. 80, 90, 140 N.E. 203 (1923) (requiring "malicious disregard").

On a Rule 12(b)(6) motion, however, a court should dismiss only if, drawing all reasonable inferences of fact to aid the pleader, it finds to a certainty that no relief could be granted. *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985); *Ragin*, 126 F.R.D. at 478. Defendant alleges that the Bank called in the loan early, secretly froze RPC's assets, refused to honor RPC's checks, failed to tell RPC of a customer check that cleared and, after default, did not as agreed, attempt to sell RPC as a going concern. In addition, defendant claims that the Bank used its financial leverage to control the financial decisions of RPC and to induce him to invest additional funds into the company.

On these facts defendant has stated a claim for interference with economic advantage. Though the Bank's actions could be motivated by a legitimate interest, defendant has not conceded the point.[7] More-

---

**5.** Defendant attempts to flesh out his allegations in his supporting papers. On a 12(b)(6) motion, however, we consider the pleadings only. *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989); *Teletronic Proprietary Ltd. v. Medtronic Inc.*, 687 F.Supp. 832, 836 (S.D.N.Y.1988) (claims "may not be amended by the briefs in opposition to a motion to dismiss, and thus, cannot be considered at this time.")

**6.** In addition, New York permits recovery for prima facie tort upon a showing of malice and special damages. *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 464 N.Y.S.2d 712, 720–21, 451 N.E.2d 459, 467–68 (1983). Though defendant may be able to prove scienter, he has failed to allege special damages as prima facie tort requires. *Id.* 464 N.Y.S.2d at 721, 451 N.E.2d at 468; *Widger v. Central School District*, 20 A.D.2d 296, 247 N.Y.S.2d 364, 367 (4th Dep't 1964).

The Bank also claims that defendant needs to show special damages on his interference with economic advantage claim. Plaintiff's Sur-Re-

ply Brief at 6–7. Nonetheless, the cases the Bank cites fail to support its argument. *Marcella v. ARP Films, Inc.*, 778 F.2d 112, 119 (2d Cir.1985), for example, involved a prima facie tort claim. The courts in the other cases the Bank cites did not require special damages. *See PPX Enterprises*, 818 F.2d at 269–70; *Hammerhead Enterprises, Inc. v. Brezenoff*, 551 F.Supp. 1360, 1369 (S.D.N.Y.1982), *aff'd* 707 F.2d 33 (2d Cir.), *cert. denied* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983); *see also Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832 (2d Cir.1980).

**7.** To support its position that defendant has not stated a claim for interference, the Bank cites *In re Rubin Bros.*, 73 B.R. at 357–58. In that case, the court dismissed an interference count for failing to state a claim because the plaintiffs specifically alleged that lender Chemical Bank's activities were undertaken, in part, to secure its loan position, a legitimate financial interest. *Id.* at 357–58. In the instant case, defendant has not alleged that the Bank's activities were motivated by legitimate financial interests.

over, in protecting its interest in the loan, defendant Goodman's threat to "get rough" with defendant and the failure of Goodman and Markowitz to even tell defendant of the secret reserve policy, after defendant told them of the arrest of RPC's comptroller, suggests malice. Therefore, the Bank's motion to dismiss the interference claim fails.

### 3. Fraud

Defendant has amended his fraud claim to add Goodman and Markowitz as counterclaim defendants. To state a claim for fraud under New York law, defendant must allege a representation of a material fact, falsity, scienter, deception, and injury. *Songbird Jet Ltd., Inc. v. Amax Inc.,* 581 F.Supp. 912, 925 (S.D.N.Y.1984) (Weinfeld, J.) *aff'd,* 812 F.2d 713 (1987); *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 217 (1969); *Channel Master Corp. v. Aluminum Ltd. Sales,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958); *see also Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986).

Fed.R.Civ.P. 9(b) requires that a party plead the circumstances of fraud with particularity. Defendant fails to relate his fraud claim to his factual allegations. The amended answer contains a statement of facts followed by a list of his legal claims each incorporating the earlier allegations by reference.[8] Nevertheless, defendant, in his brief, identifies the fraud as arising out of three meetings held between Markowitz, Goodman and himself.

At the first meeting, held on December 16, 1985, defendant alleges that Goodman and Markowitz promised to extend credit for another year if he invested an additional $100,000 of his personal funds to RPC. Amended Answer at ¶¶ 38–39. According to defendant, the loan officers had no intention of keeping this agreement. *Id.* On May 1, 1986, the parties met again and Grossman and Markowitz allegedly agreed to a six-month moratorium on inventory credit withdrawals. *Id.* at ¶ 41. In reliance on this agreement, defendant drafted a letter to RPC's trade creditors, which Markowitz approved, asking them to accept an extended payout. *Id* at ¶ 42. Goodman and Markowitz agreed to the moratorium, defendant alleges, to forestall these creditors from collecting the approximately $500,000 RPC had in accounts receivable before the Bank called in the loan. *Id.* at ¶ 43.

Defendant's last meeting with the Bank took place on June 5, 1986. At that meeting, Grossman told defendant that the Bank would call the loan, that no further advances would be made and that the June 6, 1986 payroll would not be met. *Id.* at ¶ 30. Defendant claims that he agreed to a peaceful surrender of assets in return for the Bank paying back pay, vacation pay, commissions and health insurance premiums for all RPC's employees and using its best efforts to maximize the net proceeds form the sale of RPC's assets. *Id.* at ¶ 32. The Bank broke this agreement, defendant adds, when it shut off the WATS line, farmed out parts orders and stated that it would sell RPC's assets to its trade customers. *Id.* at ¶ 36. Defendant contends that the Bank's actions ended any possibility of selling RPC's assets to a bulk purchaser or as a going concern. *Id.* at ¶ 37.

Defendant has not set forth a claim for fraud. As noted, defendant claims that at each of the meetings the bank officers committed fraud by entering into agreements they had no intention of keeping, thereby inducing defendant to perform his end of the agreements. Statements of future intent do not satisfy the requirement that the fraud involve representation of a material fact. *Sabo v. Dellman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906, 907 (1957); *Alanthus Corp. v. Travelers Ins. Corp.,* 92 A.D.2d 830, 460 N.Y.S.2d 549,

---

8. Judge Weinfeld, in *Rothstein v. Seidman & Seidman,* 410 F.Supp. 244, 249 (S.D.N.Y.1976), held that a complaint similar in style to defendant's met the requirements of Rule 9(b). *See also In re Rubin Bros.,* 73 B.R. at 358 n. 3.

550–51 (1st Dep't 1983); *Central Savings Bank v. Amted Realty Co.*, 274 A.D. 392, 83 N.Y.S.2d 678, 680 (1st Dep't 1948). An exception covers a party that makes a statement about a future event with intent or knowledge that the event will not occur. *Sabo*, 164 N.Y.S.2d at 716, 143 N.E.2d at 907; *Channel Master*, 176 N.Y.S.2d at 262–63, 151 N.E.2d at 835–36 (1958). The reason for the exception is that a party's beliefs or intentions are factual matters subject to deception. *Rosenwald v. Goldfein*, 3 A.D.2d 206, 159 N.Y.S.2d 333, 336 (1st Dep't) *reh. and app. den.* 3 A.D.2d 744, 161 N.Y.S.2d 568 (1957). Defendant alleges that Goodman and Markowitz made the agreements with the knowledge that they would not fulfill them. Amended Answer ¶¶ at 38, 43, 54. A party, however, cannot establish fraudulent intent solely from the non-performance of the future event. *Pope v. New York Property Insurance Underwriting Association*, 112 A.D.2d 984, 492 N.Y.S.2d 796, 797 (2d Dep't), *aff'd* 66 N.Y.2d 857, 498 N.Y.S.2d 360, 489 N.E.2d 247 (1985); *First National Bank of Rochester v. Cutali*, 75 Misc.2d 268, 347 N.Y.S.2d 655, 658 (Sup.Ct.1973) ("Ordinarily, a fraudulent intent not to per-

form cannot be inferred solely from the fact of non-performance"); *see Songbird*, 581 F.Supp. at 925 (defrauded party must allege specific facts showing that the defrauding party intended not to honor its representations). Defendant has alleged intent wholly from the Bank's non-performance of the agreements.

Further, defendant's fraud claims appear merely to restate the breach of contract claims Judge Kram dismissed in *Natwest II*. These claims do not change the nature of the action.[9] *See Vista v. Columbia Pictures*, 725 F.Supp. 1286, 1294 (S.D.N.Y.1989) (Sand, J.) ("The inclusion of allegations of intent and/or concealment in the complaint 'does not change the nature of the action from an action upon contract to an action upon fraud' " (citations omitted)); *Brick v. Cohn–Hall–Marx Co.*, 276 N.Y. 259, 263–64, 11 N.E.2d 902, 904 (1937); *Carnival Co. v. Metro–Goldwyn–Mayer Inc.*, 23 A.D.2d 75, 258 N.Y.S.2d 110 (1st Dep't 1965).[10]

### 4. *Consumer Fraud*

Defendant also alleges a violation of § 349(a), which prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y.Gen.Bus.Law. § 349(a)

**9.** The allegations that the Bank told defendant they would order the six month moratorium come closer to stating a claim for fraud. Markowitz's approval of the letters sent to the trade creditors makes defendant's claim of reliance more than an action for breach of contract. The alleged fraud, however, targeted the trade creditors. Although defendant alleged the Bank's actions deceived him personally, Amended Answer at ¶ 41, he has not shown how that deception took place. Moreover, though defendant alleges that RPC's financial condition was "in shambles" because of the Bank's acts of fraud and breach of contract, *id.* at ¶ 49, he has not shown how this particular instance of fraud, which appears directed at the trade creditors, proximately caused him injury. *See Cumberland*, 791 F.2d at 1044.

**10.** Defendant, in his Reply Memorandum at 23, points to other claims of fraud, based on allegations contained in the statement of facts of the amended answer, consisting of: (a) the Bank's failure to tell defendant of its decision to end its relationship with Tikijian, (b) the Bank's failure

to inform defendant of the secret reserve policy, (c) the Bank's falsely telling defendant that an $82,000 customer check had not yet cleared and (d) the Bank's falsely indicating to defendant that its decision to terminate its relationship with RPC was based solely on its policy of focusing on investments in the New York metropolitan area. *Id;* Amended Answer at ¶¶ 18, 29, 44, 23.

In regard to claims (a), (b) and (d), the amended answer fails to allege that the Bank made these representations with the intent to deceive, one of the elements required for a showing of fraud. *Songbird*, 581 F.Supp. at 925. The fourth claim, claim (c), presents a closer case because ¶ 44 of the amended answer states that the Bank told defendant that the check did not clear as part of a plan to prevent him from drawing funds on that check. Nevertheless, defendant has failed to allege any injury arising from this misrepresentation. *Cumberland*, 791 F.2d at 1044. In particular, defendant has not alleged that he would have drawn funds on that check but for the Bank's fraud or shown, in any other way, how the Bank's action injured him.

(McKinney Supp.1988). Enacted by the state legislature in 1970, the law initially provided only for enforcement at the Attorney General's discretion. In 1980, however, the legislature amended the law to provide a private right of action. N.Y.Gen. Bus.Law § 349(h).[11]

Although the statute does not explicitly limit the people who can exercise the private right of action, Judge Weinfeld, in *Genesco Entertainment, a Division of Lymutt Industries, Inc. v. Koch,* 593 F.Supp. 743, 750–52 (S.D.N.Y.1984), found that the practice must recur frequently or have consequences for the public at large. *Id.* at 752. *Genesco* involved a contract to rent Shea stadium for a rock music concert. Judge Weinfeld refused to apply § 349(a) to what he termed a "single-shot transaction" that was "different in kind and degree from those that confront the average consumer who requires the protection of a statute against fraudulent practices." *Id.* at 752.

Judge Weinfeld looked to other provisions of the statute, such as its title and the $50 dollar minimum remedy, as proof that the legislature did not intend § 349(a) to cover large scale commercial transactions. *Id.* at 751. He also noted the broad scope of the remedy—§ 349(a) does not require intent to deceive or make specific pleadings—if applied to complex financial transactions would alter commercial relationships in New York. *Id.* Such a broad application of § 349(a) would, in effect, bypass the existing law on commercial fraud. *Id.* at 752.

Other cases have followed *Genesco.* In *Morris v. Gilbert,* 649 F.Supp. 1491, 1496–97 (E.D.N.Y.1986), the court refused to apply § 349(a) to a security fraud case because "securities are purchased as investments, not as goods to be 'consumed' or 'used.'" *Id.* at 1497. *See also Rubin v. Telemet,* 698 F.Supp. 447, 451 (S.D.N.Y.1988) (refusing to apply § 349(a) to one-time failure to deliver goods because public interest not implicated); *Azby Brokerage Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 (S.D.N.Y.1988) (refusing to apply § 349(a) to claim of insurance agents for commissions); *Nardella,* 621 F.Supp. at 1172 (refusing to apply § 349(a) to claim of attorney malpractice).

Defendant's claim, like the contract in *Genesco,* involves complex financial transactions, beyond the realm of the ordinary consumer's experience. Although corporations have been plaintiffs, and banks have been defendants, under § 349(a), the cases defendant cites each concern straightforward contractual relationships. *Littlefield v. Goldome Bank,* 142 A.D.2d 978, 530 N.Y.S.2d 400, 401 (1988) (§ 349(a) applies to class action against bank for Goldome adding a $3 monthly charge for those accounts totaling $250 or less); *Schroders, Incorporated v. Hogan Systems, Inc.,* 137 Misc.2d 738, 522 N.Y.S.2d 404, 406 (Sup.Ct.1987) (§ 349(a) governs suit for faulty installation of a computer system); *Sulner v. General Accident Fire and Life Assurance Corporation,* 122 Misc.2d 597, 471 N.Y.S.2d 794, 796–97 (Sup.Ct.1984) (corporation can sue insurance company under § 349(a) for satisfaction of a water damage claim). Defendant's relationship with the Bank differed from that of the ordinary consumer in that the Bank exposed $4 million of its own capital to loss. As an investor, the Bank has the same commercial rights as other investors including the right to common law protections against fraud. *See Genesco,* 593 F.Supp. at 752. Accordingly, defendant has not stated a claim under § 349(a).

*Conclusion*

For the reasons stated, we recommend that leave to amend the answer should be

---

**11.** Section 349(h) provides, in pertinent part: ... any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages, whichever is greater, or both such actions.

denied in regard to the claims barred by the law of the case. Defendant, may raise those claims again if the court rules in his favor. Also, we recommend that leave to amend to assert the fraud and consumer fraud claims be denied. As for the rest of the amended answer, we recommend that leave to amend be granted.

Copies of this report have been mailed this date to all parties listed below, who are hereby advised of their right to file objections with Judge Kram on or before February 1, 1990. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e). Failure to object to this report by that date will preclude appellate review. *Small v. Secretary*, 892 F.2d 15, at 16 (2d Cir.1989).

Dated: New York, New York

January 12, 1990

Respectfully Submitted,

/s/ Leonard Bernikow

LEONARD BERNIKOW

United States Magistrate

cc: Edward N. Meyer, Esq.

Arthur P. Hui, Esq.

Winston & Strawn, Cole & Deitz

175 Water Street

New York, New York 10038

Helen Davis Chaitman, Esq.

Sean Sullivan, Esq.

Ross & Hardies

580 Howard Avenue

Somerset, New Jersey 00875–6739